# HARRY V. KEEFE, JR. *v.* NORWALK COVE MARINA, INC., ET AL.
## (AC 18261)

Lavery, Landau and Dupont, Js.[1]

Argued January 11—officially released May 9, 2000

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

*John J. Ryan*, with whom, on the brief, was *Nancy D. Gallagher*, for the appellant-appellee (named defendant).

*Brendan J. O'Rourke*, for the appellee-appellant (plaintiff).

*Opinion*

LAVERY, J. The named defendant, Norwalk Cove Marina, Inc. (marina), appeals from the judgment of the trial court awarding damages in a breach of contract case. On appeal, the marina claims that the trial court improperly found that a valid contract existed between the parties. It specifically argues that the contract lacked consideration and that the agreement violated the statute of frauds. The plaintiff, Harry V. Keefe, Jr., in his cross appeal, contends that the court improperly (1) failed to award him maintenance, transportation and cost of sale expenses arising from the contract, (2) awarded a $30,000 setoff for moneys withheld and (3) found that the defendant James Gardella, an officer of the marina, was not personally liable for the debts of the corporation. We affirm in part and reverse in part the judgment of the trial court.

The trial court found the following facts. In the fall of 1993, the plaintiff read an advertisement in a trade magazine about an Azimut motor yacht (yacht) that

was being built in Italy. The plaintiff flew to Italy, met with the manufacturer, Vitelli, and agreed to purchase the yacht for $1,725,000. Vitelli advised the plaintiff that the marina was its dealer and agent in the United States, and would be responsible for coordinating the purchase and shipment of the yacht to the United States and for performing any warranty work on the yacht. The marina and Gardella played no role in the negotiations for the purchase, which were conducted directly between the plaintiff and the manufacturer in Italy. The marina, at the plaintiff's request, shipped certain items to Italy for installation on the yacht. In June, 1994, the Italian manufacturer paid the marina a $300,000 commission in connection with the plaintiff's purchase of the yacht.

The plaintiff and Gardella first met in February, 1994, to discuss the purchase of the yacht and the trade-in of the plaintiff's own motor yacht, a 1991 model fifty-two foot Hatteras (Hatteras). In April, 1994, the plaintiff and the marina signed a written agreement. The agreement provided that the sale price of the yacht was $1,725,000 plus optional equipment and transportation charges. The agreement also provided that the marina was giving the plaintiff an "allowance" for the used boat trade-in, which totaled $653,900. This trade-in figure was used by the plaintiff to calculate and pay the Connecticut sales tax on the yacht. The sales tax was thus based on the sales price of $1,725,000 less the allowance of $653,900 for the trade-in.

The April, 1994 agreement did not fully reflect what actually occurred in the transaction. The plaintiff paid the Italian manufacturer the full purchase price without deducting the trade-in allowance, and the marina never took title to the Hatteras or paid the plaintiff any money. The plaintiff withheld $30,000 from the purchase price pending certain alterations and changes to the yacht. When those were completed, the plaintiff refused to pay the $30,000.

After the Hatteras was brought to the marina, from April, 1994, until October, 1995, the marina used its best efforts to sell the Hatteras, including advertising and displaying it at several trade shows. The marina performed some minor repairs on the Hatteras, but overall it was in good working order when it arrived at the marina. In the meantime, the market for yachts the size of the Hatteras took a downturn, and the marina was not successful in selling the Hatteras. In October, 1995, the plaintiff, with the permission of the marina, sent the Hatteras to Florida, where it was listed with a broker at $775,000. The Hatteras ultimately sold for $525,000 in April, 1996. The plaintiff netted $480,000 after paying a sales commission of $40,000 and a survey adjustment of $4200. The plaintiff incurred costs of approximately $56,000 in transporting the Hatteras to Florida and docking it there for six months until the boat was sold, as well as the costs of labor, taxes, fuel and insurance.

In his complaint, the plaintiff alleged that the defendants had breached the parties' agreement by failing to pay him the trade-in allowance of $653,900 for the Hatteras and by failing to pay him interest on that amount from the date of the agreement.[2] The defendants filed a counterclaim for damages in the amount of $30,000 arising from the plaintiff's failure to pay for alterations made to the yacht prior to its shipment from Italy. At trial, Gardella testified that the defendants had agreed only that they would use their best efforts to sell the Hatteras and that they would pay the plaintiff whatever the boat sold for. According to Gardella, the figure of $653,900 was only an estimate of the anticipated sales price.

[2] The plaintiff also pleaded fraudulent misrepresentation and violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. These allegations were rejected by the trial court, and its rulings with respect to them are not challenged on appeal.

The court found that the defendants had agreed to a trade-in allowance of $653,900. It also found that the plaintiff was entitled to recover the difference between that guaranteed trade-in price and the eventual gross sales price of the Hatteras. The court rejected the plaintiff's claim that he should receive the difference between the trade-in allowance and the net amount he received, that he was entitled to a credit for the expenses that he incurred in connection with selling the boat in Florida, and that he was entitled to interest on the $653,500 trade-in allowance. On the counterclaim, the court found that the plaintiff had breached the agreement by refusing to pay the defendants $30,000 for alterations to the yacht. The court awarded the plaintiff the sum of $128,900, which is the difference between the trade-in allowance for the Hatteras and its eventual sales price, less $30,000 for work done on the yacht, for a total judgment of $98,900. The court rendered judgment against the marina only, having found that Gardella acted as an officer of the marina at all pertinent times and that there was no basis on which to hold him individually liable.

## I

"As an appellate court, our review of trial court decisions is limited to determining whether their legal conclusions are legally and logically correct, supported by facts set out in the memorandum of decision. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). *Harris Calorific Sales Co.* v. *Manifold Systems, Inc.*, 18 Conn. App. 559, 563, 559 A.2d 241 (1989). Whether a contract or a subsequent modification exists is a question of fact for the court to determine. [*Harris Calorific Sales Co.* v. *Manifold Systems, Inc.*, supra, 563]; see also *Three S. Development Co.* v. *Santore*, 193 Conn. 174, 177–78, 474 A.2d 795 (1984); *Randolph Construction Co.* v. *Kings East Corp.*, 165 Conn. 269, 277, 334 A.2d 464 (1973); *Ther-*

*moglaze, Inc.* v. *Morningside Gardens Co.*, 23 Conn. App. 741, 745, 583 A.2d 1331, cert. denied, 217 Conn. 811, 587 A.2d 153 (1991). If the factual basis of the court's decision is challenged, our review includes determining whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . *Harris Calorific Sales Co.* v. *Manifold Systems, Inc.*, supra, 563." (Internal quotation marks omitted.) *New England Rock Services, Inc.* v. *Empire Paving, Inc.*, 53 Conn. App. 771, 775, 731 A.2d 784, cert. denied, 250 Conn. 921, 738 A.2d 658 (1999).

A

The marina argues that the court improperly found consideration in an agreement where none existed. We disagree.

"The doctrine of consideration is of course fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable. In defining the elements of the rule, we have stated that consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. . . . An exchange of promises is sufficient consideration to support a contract." (Citations omitted; internal quotation marks omitted.) *Osborne* v. *Locke Steel Chain Co.*, 153 Conn. 527, 530–31, 218 A.2d 526 (1966).

Simply put, the agreement between the plaintiff and the marina is enforceable because consideration does exist. The marina received the benefit of a $300,000 commission for the sale of the yacht to the plaintiff, when in fact it did very little to consummate the deal, as the plaintiff dealt primarily with the manufacturer. In exchange for this consideration, the plaintiff received a promise from the marina that it would guarantee a

sale "trade-in" price of no less than $653,900 on the ultimate sale of the Hatteras. He also received a credit that reduced the Connecticut sales tax that otherwise would be due.

The fact that the marina never took title to the Hatteras throughout the transaction does not affect this result. The agreement between the parties, not just as reflected in the agreement, but as fully contemplated by them, did not require that the marina take possession or title of the Hatteras. As the court stated in its memorandum of decision: "In reality, the plaintiff paid the manufacturer in Italy the full purchase price without any credits, and the defendants never took title to the Hatteras or paid the plaintiff any money. The defendants, however, prepared the April [1994 written] agreement, which provided for a specific trade-in allowance for the Hatteras, as if the Hatteras had in fact been traded in, and the sales tax was calculated on the difference between that figure and the total purchase price. The agreement did not require that the defendants take title to the Hatteras or provide for what would happen if the Hatteras was sold for a price less than the specified trade-in. The court believes that the defendants are bound by this contract and the obligation therein to pay a specific trade-in allowance."[3]

We agree with the trial court and conclude that sufficient consideration existed between the plaintiff and the marina to form a contract.

B

We also conclude that this agreement incorporates the nonwritten details of the trade-in agreement without violating the statute of frauds or the parol evidence rule. As noted here and previously, the written agreement did

---

[3] It was noted at oral argument that one apparent reason for this "hybrid agreement" without a direct trade-in was that the marina did not have sufficient funds to pay the plaintiff the appropriate credit for the yacht.

not fully reflect what the parties contemplated regarding the transaction. The use of nonwritten information outside the four corners of an agreement implicates the statute of frauds. The statute of frauds states that agreements must be in writing if certain conditions are present. General Statutes § 42a-2-201 (1). "To comply with the statute of frauds an agreement must state the contract with such certainty that its essentials can be known from the memorandum itself, without the aid of parol proof, or from a reference contained therein to some other writing or thing certain; and these essentials must at least consist of the subject of the sale, the terms of it and the parties to it, so as to furnish evidence of a complete agreement." (Internal quotation marks omitted.) *Breen* v. *Phelps*, 186 Conn. 86, 92, 439 A.2d 1066 (1982). The essential terms of the contract, and not every single term of the contract, must be set forth therein. *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, 38 Conn. App. 420, 426, 662 A.2d 129 (1995), aff'd, 237 Conn. 123, 676 A.2d 369 (1996). Our courts prefer interpretations that find agreements sufficiently definite to satisfy the statute of frauds. Id., 427.

The essentials of the agreement between the plaintiff and the marina are present in the written contract. The contract states, among other things, the subject of the sale, its terms, the relevant parties, the price and the value of the trade-in allowance. The contract therefore satisfies the statute of frauds.

Furthermore, the nonwritten understanding regarding the details of the trade-in agreement is part of the agreement and does not violate the parol evidence rule. "The parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. *Giorgio* v. *Nukem, Inc.*, 31 Conn. App. 169, 173–74, 624 A.2d 896 (1993); see also 2 Restatement (Second), Contracts § 213 (1981)." (Internal quotation marks omitted.) *Foley* v. *Huntington Co.*, 42 Conn. App.

712, 733, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996). Although extrinsic information may not be used to vary or contradict certain written agreements, it may be used, as it is here, to aid in ascertaining the meaning of the parties' contract. *Harris* v. *Clinton*, 138 Conn 657, 662, 88 A.2d 542 (1952); *Fernandez* v. *Thompson*, 104 Conn. 366, 369, 132 A. 895 (1926); *Foley* v. *Huntington Co.*, supra, 734; *Shawmut Bank Connecticut, N.A.* v. *Connecticut Limousine Service, Inc.*, 40 Conn. App. 268, 275, 670 A.2d 880, cert. denied, 236 Conn. 915, 673 A.2d 1143 (1996). The non-written details of the trade-in agreement were not used to vary or contradict the terms of the contract, but to ascertain the meaning of its terms and determine the intent of the parties.

II

In his cross appeal, the plaintiff contends that the court improperly calculated damages regarding the difference between the guaranteed trade-in allowance and the amount actually received from the sale of the Hatteras. We agree.

The trial court has broad discretion in determining damages, and we will not overturn its decision unless it is clearly erroneous. *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 68, 717 A.2d 724 (1998). "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) Id. The plaintiff's cross appeal attacks the legal conclu-

sions of the trial court as being legally and logically incorrect.

The court concluded that the plaintiff should recover $128,900, the difference between the trade-in allowance of $653,900 and the ultimate sale price of $525,000. The court did not award the plaintiff $44,200 incurred in selling the Hatteras or $56,696 in expenses relating to the maintenance of the Hatteras. These costs were incurred when the plaintiff took control of the Hatteras and made his own attempts to sell it when efforts by the marina had failed.

"[C]ontract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of the bargain by awarding a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." (Internal quotation marks omitted.) *Colby* v. *Burnham*, 31 Conn. App. 707, 721, 627 A.2d 457 (1993); see also *Frederick Raff Co.* v. *Murphy*, 110 Conn. 234, 242, 147 A. 709 (1929). Such damages, moreover, are to be determined at the time of the breach. *Colby* v. *Burnham*, supra, 721. The non-breaching party has a duty to minimize any damages as a result of the breach. *Ann Howard's Apricots Restaurant, Inc.* v. *Commission on Human Rights & Opportunities*, 237 Conn. 209, 229, 676 A.2d 844 (1996); *Moore* v. *Sergi*, 38 Conn. App. 829, 843, 664 A.2d 795 (1995). Furthermore, a nonbreaching party who attempts to mitigate his losses may recover his expenditures toward that goal from the breaching party. 22 Am. Jur. 2d, Damages § 608 (1988).

The court stated in its memorandum of decision: "The evidence disclosed that over the course of the next year and a half, beginning in April, 1994, when the Hatteras was brought to Cove Marina, the defendants used their best efforts to sell the Hatteras, including advertising

and displaying it at several trade shows. . . . In October, 1995, the plaintiff, with the acquiescence of the defendants, sent the Hatteras to Florida, where it was listed for sale by a broker at $775,000 and ultimately sold for [the gross selling price of] $525,000 in April of 1996."

"Where no time for the performance of a contract is contained within its terms, the law presumes that it is to be performed within a reasonable time." (Internal quotation marks omitted.) *Colby* v. *Burnham*, supra, 31 Conn. App. 715. The marina made reasonable efforts over a reasonable time to attempt to sell the Hatteras, but failed to do so. The plaintiff prudently took the matter into his hands with the acquiescence of the marina, took possession of the boat and attempted to sell the Hatteras on his own. The plaintiff maintained the boat during that time and transported it to Florida with the hope that the marketplace there would be more receptive to his offer to sell.

The failure of the court to award the plaintiff his transportation and maintenance costs as damages prevented him from receiving the benefit of his bargain and compensation for the expenses incurred by him when he attempted to mitigate any damages by selling the yacht. Such damages are appropriate where a party seeks to complete the agreement and to minimize the financial harm arising out of the transaction. We therefore conclude that the failure of the court to award cost of sale and expense damages in the amount of $44,200 and maintenance damages in the amount of $56,696 was clearly erroneous.

### III

The plaintiff, in his cross appeal, further contends that the court improperly awarded a $30,000 setoff to the marina for moneys held back by the plaintiff pending the completion of work due on the yacht. We disagree.

Applying the appropriate standard of review; see *New England Rock Services, Inc.* v. *Empire Paving, Inc.*, supra, 53 Conn. App. 775; we conclude that the court's decision should not be reversed on this ground. "The concept of setoff allows entities that owe each other money to apply their mutual debts against each other, thus avoiding the absurdity of making 'A' pay 'B' when 'B' in fact owes 'A.' " *OCI Mortgage Corp.* v. *Marchese*, 56 Conn. App. 668, 676, 745 A.2d 819, cert. granted on other grounds, 253 Conn. 903, 753 A.2d 937 (2000). The court stated in its memorandum of decision: "The . . . issue is whether the plaintiff is obligated to pay the defendants $30,000 as asserted in their counterclaim. The April 11, 1994 agreement provides that '[the plaintiff] also will hold back $30,000 pending completion of work by Azimut prior to shipment from Italy to U.S. per agreement with Jack Haight.' This work was completed, so the defendants have sustained their burden of proof on their counterclaim."

The agreement to purchase the yacht was arranged directly between the plaintiff and Vitelli, the Italian manufacturer. Vitelli advised the plaintiff, however, that the marina was its dealer and agent in the United States, and would be responsible for coordinating the purchase of the yacht and its shipment to this country. In other words, the marina is the manufacturer's agent and is the proper recipient for any moneys due on the purchase of the yacht. The marina, as the manufacturer's agent and dealer in the United States, has a duty to collect funds for the manufacturer that are due the manufacturer from sales of its products. See *Bond Rubber Corp.* v. *Oates Bros., Inc.*, 136 Conn. 248, 251, 70 A.2d 115 (1949); *Carrier* v. *McLlarky*, 693 A.2d 76, 78–79 (N.H. 1997); 2 Restatement (Second), Agency § 427, p. 296 (1958). Accordingly, the $30,000 held back by the plaintiff pending completion of work due on the yacht was properly awarded as a setoff to the marina.

## IV

Finally, the plaintiff contends in his cross appeal that the court improperly found that Gardella was not individually liable for the marina's debts. We disagree.

This conclusion is not clearly erroneous. See *New England Rock Services, Inc.* v. *Empire Paving, Inc.*, supra, 53 Conn. App. 775. The court stated in its memorandum of decision: "This judgment is not entered against the individual defendant, James Gardella, as he was acting as an officer of the defendant corporation, Cove Marina, at all pertinent times, and there is no basis to suggest he is individually liable for the debts of the corporation." Sufficient facts exist to support this conclusion. The agreement to purchase the yacht was signed by Jack Haight as a representative of the marina. No evidence exists that Haight held the authority to bind Gardella personally upon this act.

In the plaintiff's first request for admissions, the plaintiff asked the defendants to admit "[t]hat James Gardella personally promised [the plaintiff] a trade-in allowance on Plaintiff's Hatteras on the purchase of a yacht named 'Azimut' by Plaintiff through Norwalk Cove Marina, Inc." The defendants in their answer admitted that that statement was true.

The court's conclusion that this admission does not make Gardella personally liable for the debts of the marina is not clearly erroneous. The plaintiff attempts to use this admission to bind Gardella by making him, in essence, a personal guarantor of the marina's actions. The admission, however, does not concede such personal liability and makes no mention of any status of Gardella as guarantor. In effect, the plaintiff asks us to hold Gardella personally liable by piercing the marina's corporate veil of protection against shareholder liability. See *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 552–54, 447 A.2d 406 (1982).

Courts pierce the corporate veil only under "exceptional circumstances"; id., 557; and we decline to apply this remedy here.

The judgment is reversed on the plaintiff's cross appeal only as to the trial court's calculation of damages and the case is remanded for further proceedings to recalculate the award of damages consistent with this opinion.

In this opinion the other judges concurred.